702 A.2d 514

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JAMES T. WHITE, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 20, 1997—Decided November 21, 1997.

Before Judges PETRELLA, SKILLMAN and WERTHEIMER.

*Carl H. Hadigian*, attorney for appellant.

*Peter Verniero*, Attorney General, attorney for respondent (*Nancy Peremes Barton*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

After his suppression motion was denied, defendant James T. White entered a *retraxit* plea of guilty to third degree receiving stolen property (*N.J.S.A.* 2C:20–7). White was sentenced to two years of probation, and assessed a Victims of Crime Compensation Board penalty of $50 and a Safe Neighborhood Services Fund fine of $75.

On appeal, permitted pursuant to *R.* 3:5–7(d) despite his plea of guilty, White asserts that the Law Division judge erred in ruling that police officers from the City of Orange were authorized to conduct a warrantless search of a residence in the City of Newark, notwithstanding their investigation of a crime that had been committed in the City of Orange and the consent of the owner of the residence. Accordingly, White contends that the stolen property seized at the premises should have been suppressed as the fruit of the poisonous tree. *See Wong Sun v. United States*, 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.*2d 441 (1963).

The suppression hearing was conducted essentially based on a submission of the following facts to the trial court by the parties. Officers of the Orange Police Department were conducting an investigation of a June 21, 1995 burglary and theft from premises in the City of Orange. During the investigation the police obtained a written statement from a witness that led them to suspect an individual named Eugene Baxter was involved in the incident. Baxter was arrested on July 26, 1995, and gave an inculpatory statement to the police in which he named White as an individual who purchased some of the stolen property from him.[1] Baxter provided the Orange police with White's address and directions to his residence in Newark.

As a result of that statement, the same day the City of Orange police officers went to White's residence in Newark where they identified themselves as law enforcement officers to White's mother. At the time the Orange police officers went to White's residence, they were not accompanied by any Newark police officer or representative of the prosecutor's office. At the officers' request, White's mother consented to a search of her residence and signed a form captioned "ORANGE POLICE DEPARTMENT" and *"CONSENT TO SEARCH."*[2] The search of the

---

[1] Baxter subsequently pleaded guilty to an accusation charging him with the offense.

[2] The consent to search form read:

I, *BENNIE WHITE,* HEREBY DO FREELY AND VOLUNTARILY EXTEND DETECTIVE(S), *DET. WEBSTER, LT. SMITH,* Det. Dvs., OF THE ORANGE POLICE DEPARTMENT THE RIGHT TO SEARCH *MY RESIDENCE FOR STOLEN PROPERTY.* THIS CONSENT IS GRANTED WITHOUT ANY PRESSURE OR THREATS, DIRECT OR INDIRECT BEING PLACED ON ME AND WITH THE FULL REALIZATION THAT I HAVE THE RIGHT TO REFUSE TO CONSENT AND, THAT IF I SO REFUSE, NO SEARCH WILL BE CONDUCTED. I AM AWARE THAT THE OFFICER(S) CONDUCTING THIS SEARCH ARE SEEKING EVIDENCE PERTAINING TO A VIOLATION OF THE CRIMINAL LAWS OF THE STATE OF NEW JERSEY, . . .

At the bottom of the page there was an itemized list of the articles taken as evidence which included a Fedders Air Conditioner found in the second floor

premises yielded several items which the officers suspected had been stolen in the burglary in the City of Orange and those items were seized by the officers.

On July 28, 1995, White gave a statement at the Orange Police Department in which he identified photographs of the subject property as items which codefendant Dwayne Rufus Brown sold to him. White was arrested for receiving stolen property and subsequently pleaded guilty after his suppression motion was denied. At the plea hearing, he said that two men, Baxter and another whom he knew as Balal, had approached him and offered to sell him a computer, an air conditioner, and an answering machine. Although the low price led him to believe that the items might have been stolen, he nevertheless bought them. It was stipulated that the property purchased was of a value in excess of $500.

White argues that the City of Orange police officers lacked statutory authority to investigate and seize property outside of their jurisdiction. This argument was rejected by the Law Division judge on the suppression motion. There was no challenge there or here to the consent given by White's mother for the search on the basis of any form of coercion.

Defendant asserts that *N.J.S.A.* 40A:14–152, which defines the powers of police officers and constables, essentially should be read to prohibit all police action outside a municipality for which they have been appointed, other than those specified in other statutory exceptions.[3]

We reject White's argument. *N.J.S.A.* 40A:14–152 states:

---

window; an IBM wheelwriter found in the first floor hallway; a Compudyne monitor, found in the first floor living room, and an answering machine in the second floor bedroom.

[3] Exceptions include authority of full-time permanently appointed officers to arrest for any crime committed in their presence within the State (*N.J.S.A.* 40A:14–152.1); authority to assist in an emergency in another jurisdiction if requested by competent authority, (*N.J.S.A.* 40A:14–156); and authority to arrest for certain motor vehicle violations committed in the officer's presence (*N.J.S.A.*

> The members and officers of a police department and force, within the territorial limits of the municipality, shall have all the powers of peace officers and upon view may apprehend and arrest any disorderly person or any person committing a breach of the peace. Said members and officers shall have the power to serve and execute process issuing out of the courts having local criminal jurisdiction in the municipality and shall have the powers of a constable in all matters other than in civil causes arising in such courts.

Our reading of the relevant statutes satisfies us that the Legislature contemplated that police officers may at times be called upon to go beyond the boundaries of their municipality in the performance of their official duties. Indeed, *N.J.S.A.* 40A:14–152.1 and 40A:14–152.2 implicitly recognize this. *N.J.S.A.* 40A:14–152.1 gives a municipal police officer authority to arrest for a crime committed in the officer's presence anywhere within the State. *See State v. Montalvo,* 280 *N.J.Super.* 377, 381, 655 *A.*2d 476 (App.Div.1995); *State v. O'Donnell,* 192 *N.J.Super.* 128, 469 *A.*2d 38 (App.Div.1983). *N.J.S.A.* 40A:14–152.1 extends certain immunities statewide to police acting outside of their municipalities.

Although a crime was not committed in the officer's presence, and hence the provisions of *N.J.S.A.* 40A:14–152.1 were not triggered, the issue is whether the statute precludes or prohibits extraterritorial exercise of jurisdiction in the absence of statutory authorization constituting exceptions to the local jurisdiction. Nothing in the cited statute either expressly precludes on the one hand or authorizes on the other hand a police officer from the jurisdiction in which a crime occurred from conducting an investigation outside of the territorial boundary of the officer's express jurisdiction. Few cases have addressed the issue of police investigations beyond the territorial limits of a police officer's express jurisdiction. Other jurisdictions have considered the issue and have approved such investigations. *See Parker v. State,* 362 *So.*2d 1033, 1034 (Fla.Ct.App.1978), *cert. denied,* 373 *So.*2d 460 (1979) (despite municipal police officer not being authorized to arrest

39:5–25). *See State v. O'Donnell,* 192 *N.J.Super.* 128, 469 *A.*2d 38 (App.Div. 1983). *See also* the Fresh Pursuit Act, *N.J.S.A.* 2A:156–1 *et seq.*

outside of his jurisdiction, absent hot pursuit, nonetheless officer may conduct lawful investigation outside territorial jurisdiction); *State v. Calderon,* 67 *Or.App.* 169, 678 *P.*2d 1245 (1984); *People v. Harvey,* 48 *Ill.App.*2d 261, 199 *N.E.*2d 236 (1964).

The Oregon court considered extraterritorial investigations in *State v. Calderon,* 67 *Or.App.* 169, 678 *P.*2d 1245 (1984). In *Calderon,* the defendant was involved in an accident in Polk County. A deputy sheriff was called to the scene, and arrived there after the defendant was removed to a hospital in Marion County. The sheriff saw beer cans in the car and, based upon that and other evidence, went to defendant's hospital room. The sheriff asked the attending physician to draw a blood sample; defendant later contested this search on several grounds, including a contention that the search exceeded the officer's authority because it occurred outside his jurisdiction. *Id.* 678 *P.*2d at 1247–1249. The court specifically considered the narrow question which has been posed to this court:

may an officer from one jurisdiction make a warrantless seizure in another jurisdiction when he does not have the authority to make a warrantless arrest or no local officer is present and assisting in the seizure?

*Id.* 678 *P.*2d at 1249.

Noting that "[a] warrantless search is by its nature based on the necessity of quick action that does not allow the officer to apply for a warrant ..." the court pronounced that "any police officer may ... conduct a search without a search warrant in any jurisdiction within the state." This was apparently on the basis that all warrantless searches have an exigency element.

The Illinois court was presented with a factually similar case in *People v. Harvey,* 48 *Ill.App.*2d 261, 199 *N.E.*2d 236 (1964). In that case, the defendant's house in Bridgeview was searched upon his wife's consent to Chicago police officers to search the premises without a warrant. *Id.* 199 *N.E.*2d at 237. The court summarily dismissed the appellant's argument that this was outside the officers' authority, noting:

The officers were investigating the commission of a crime and had the power to seek the fruits ... especially where their actions and conduct, as shown here, were

open and sincere. It was within their powers to seek and protect the property taken in the commission of a crime.

[*Id.* 199 *N.E.*2d at 238–239].

The court in *Harvey* refused to consider the rights that the defendant would have had if a private citizen had conducted the search. *Id.* 199 *N.E.*2d at 239.

Likewise, the Supreme Court of Pennsylvania rejected a claim that a municipal police officer could not investigate a crime outside the territorial limits of his own jurisdiction in *Commonwealth v. O'Shea*, 523 *Pa.* 384, 567 *A.*2d 1023 (1989), *cert. denied*, 498 *U.S.* 881, 111 *S.Ct.* 225, 112 *L.Ed.*2d 180 (1990). In *O'Shea* Pittsburgh police detectives went to defendant's residence in another township to interrogate him concerning a homicide that occurred in Pittsburgh. The Pittsburgh detectives did not obtain consent for the investigation in the municipality where defendant resided. The defendant was not home when the detectives arrived, but they identified themselves and explained the purpose of their visit to defendant's brother and sister-in-law who owned the house. They gave the Pittsburgh detectives permission to enter and look around. When they did, the detectives observed in plain view certain items which they subsequently seized. Defendant arrived while the detectives were still present and voluntarily accompanied them back to Pittsburgh where he waived his constitutional rights and gave an inculpatory statement. *Id.* 567 *A.*2d at 1028–1029. The Pennsylvania Supreme Court considered its statute and the specific situations allowing extraterritorial jurisdiction in

six specific situations wherein an officer can go outside of his or her primary jurisdiction to make arrests, serve warrants and perform other official functions such as: where the officer is acting pursuant to court order; service of arrest and search warrants with consent of local law enforcement agencies; acting in hot pursuit; acting upon the request of a local law enforcement officer, and where an officer views a felony or has probable cause to believe that a felony has been committed and makes a reasonable effort to identify himself as a police officer.

[*Id.* 567 *A.*2d at 1028, citing 42 Pa.C.S.A. § 8953(a)(1)–(6) ].

Although the Pennsylvania statute did not authorize police to investigate in another jurisdiction, the court noted that it was equally clear that the act did not prohibit such investigation. *Id.*

567 *A*.2d at 1029. The court observed that if a Pittsburgh detective had telephoned defendant in his township of residence and asked him to come to Pittsburgh, the Pennsylvania statute would likewise neither authorize nor prohibit such an act. The *O'Shea* court stated:

> Similarly, we do not believe [the Act (42 Pa.C.S.A. § 8953) ] prohibits police officers from leaving their primary jurisdiction to go into other jurisdictions to ask questions therein, or to enter a residence therein, upon the consent of its owners (and full disclosure of the officers' purpose) and observe what they observe therein. Such unobtrusive police conduct is outside the scope of [the Act] and is not illegal. Any citizen of the Commonwealth could do what [the detectives] did herein, namely drive to the O'Shea residence, ask them questions, enter into their home with their consent, and look around. In the absence of explicit legislative directives to the contrary, we will not prohibit police officers from doing that which a private citizen could do.
>
> [<em>Id.</em> 567 <em>A</em>.2d at 1029].

Alternatively, the *O'Shea* court concluded that, even if there had been a violation of the jurisdiction act, automatic exclusion of the evidence obtained by searches accompanied by relatively minor infractions of criminal procedure rules would be a remedy out of all proportions to the violation. *Id.* 567 *A*.2d at 1030. *See also Commonwealth v. Saul,* 346 *Pa.Super.* 155, 499 *A*.2d 358 (1985).

We find these cases persuasive and agree that the Orange police could investigate an offense committed in Orange by going to another municipality to question persons with relevant knowledge. In coming to this conclusion we note that the United States and New Jersey Constitutions protect the right of the people to freedom from unreasonable searches. *U.S. Const.* amend IV, *N.J. Const.* art. I, ¶ 7. Aside from searches conducted under a valid warrant, there are exceptions which allow a warrantless search. One of those exceptions is when there is a valid consent. *See State v. Suazo,* 133 *N.J.* 315, 319, 627 *A*.2d 1074 (1993). *See also Schneckloth v. Bustamonte,* 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043–2044, 36 *L.Ed.*2d 854 (1973), on remand to *Bustamonte v. Schneckloth,* 479 *F*.2d 1047 (9th Cir.1973).

In this case, the Orange police officers did not go to White's residence to execute an arrest or a search warrant, but only to

investigate. Although police officers normally exercise their powers within the confines of the jurisdiction which employs them, *State v. Cohen*, 73 *N.J.* 331, 342, 375 *A.*2d 259 (1977), investigation is not a power inhering just in the office of police officer and is not exclusive to police officers.

Here, White's mother consented to the search. There is no basis in the record to seek to go behind that consent. Of course, consent includes knowledge by the person involved of a choice in the matter. *State v. Johnson*, 68 *N.J.* 349, 354, 346 *A.*2d 66 (1975). This would normally be a fact question, but that issue is not present in this case. Here, the consent was given by White's mother to uniformed police officers who exhibited badges. The issue of their authority or whether they were acting as officers or private citizens was not directly raised, and the record does not reflect whether White's mother believed she gave her consent to a Newark police officer, or whether that would have made a difference.

Defendant relies on *State v. Williams*, 136 *N.J.Super.* 544, 548, 347 *A.*2d 33 (Law Div.1975), in which Judge Schiaffo rejected an alternative basis of consent to search in a motor vehicle stop. There a motorist was stopped for a motor vehicle violation by a Park Ridge police officer in Montvale. *Williams* does not support White's position in this case. There, although the judge rejected the State's argument that the officer could have acted as a private citizen when he observed the disorderly persons infraction, stopped defendant's van and asked for consent to search, the rejection was based on the comment that defendant "believed he gave his consent for a search of his vehicle to a uniformed police officer, not to a private citizen." 136 *N.J.Super.* at 548, 347 *A.*2d 33. However, the fact that a defendant might believe that he gave his consent to search to an officer as opposed to a citizen does not mean that the consent would be involuntary under the Fourth Amendment.

Moreover, the State's contention in *Williams* may also have been rejected because "consent was given justifying the search, if

the officer had the authority to stop the van." 136 *N.J.Super.* at 547, 347 *A.*2d 33. *Williams* rejected the State's argument based on a determination that the officer, as a private citizen, would not have had the authority to stop the van, as opposed to lacking the authority to request the consent to search.

In White's case, however, the Orange police officers were merely investigating a crime and no motor vehicle stop was involved. The arrest and search in *Williams* was actually validated under *N.J.S.A.* 39:5–3. This situation differs from the one before us which was simply an investigation and the informing of a nonparty of the subject of the investigation and requesting consent.

■ Even if we considered the officers' actions here a procedural violation of the statute, it would not require exclusion of the evidence obtained pursuant to the investigation beyond the borders of the officers' jurisdiction or the consent search because it did not rise to the level of a constitutional violation. *See State v. Gadsden,* 303 *N.J.Super.* 491, 503–505, 697 *A.*2d 187 (App.Div. 1997). The same applies to the seizure of the evidence. *Id.* at 503, 697 *A.*2d 187; *Commonwealth v. O'Shea, supra* (567 *A.*2d at 1030).

As indicated in the consent form, signed by the owner of the premises, it was signed without any threats or pressure and with a statement that she had the right to refuse to consent and if she did no search would be conducted. The caption of the consent to search form in fairly large print indicates that it is from the City of Orange and is a consent to search.

■ It is only "unreasonable investigative procedures which are searches and seizures within the meaning of the Fourth Amendment that are proscribed by the constitutional provisions." *State v. Citta,* 265 *N.J.Super.* 208, 212, 625 *A.*2d 1162 (Law Div.1990), *aff'd sub nom State v. Fuhs,* 265 *N.J.Super.* 188, 625 *A.*2d 1151 (App.Div.1993), *certif. denied,* 134 *N.J.* 486, 634 *A.*2d 532 (1993); *see State v. Zapata,* 297 *N.J.Super.* 160, 171, 687 *A.*2d 1025

(App.Div.1997). Because of the consent obtained, this search was not unreasonable.

Under the circumstances, the Orange police officers could properly investigate in another municipality and obtain voluntary consent to search in connection therewith.[4] The information given to White's mother that she had a right to refuse consent and the language of the consent form were adequate here to authorize the search.

Affirmed.

---

[4] Although we hold that the investigation was appropriate here, it would appear to be advisable police procedure for investigating officers of another jurisdiction to be accompanied by a representative of the police department in the jurisdiction of the person sought to be investigated. *See State v. Gadsden,* 303 *N.J.Super.* 491, 503, 506, 697 A.2d 187 (App.Div.1997). We recognize that time constraints and manpower considerations may not make this entirely feasible under all circumstances.